## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 22 2020, 9:27 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Don R. Hostetler
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:
INDIANA DEPARTMENT OF
CHILD SERVICES

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

ATTORNEY FOR APPELLEE:
CHILD ADVOCATES, INC.

DeDe K. Connor
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Involuntary Termination of the Parent-Child Relationship of: D.W. (Minor Child),<br><br>and<br><br>R.W. (Mother),<br><br>*Appellant-Respondent,*<br><br>v. | May 22, 2020<br><br>Court of Appeals Case No. 19A-JT-2587<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Marilyn Moores, Judge<br><br>The Honorable Scott Stowers, Magistrate<br><br>Trial Court Cause No. 49D09-1810-JT-1233 |

The Indiana Department of
Child Services,

*Appellee-Petitioner,*

and

Child Advocates, Inc.,

*Guardian ad Litem.*

**Tavitas, Judge.**

# Case Summary

R.W. ("Mother") appeals the termination of her parental rights to D.W. (the "Child"). We affirm.

# Issues

Mother raises two issues on appeal, which we restate as follows:

I.     Whether the trial court properly concluded that continuation of the parent-child relationship posed a threat to the Child's wellbeing.

II.    Whether the trial court properly concluded that termination of Mother's parental rights is in the Child's best interests.

## Facts

Mother and D.S.[1] ("Father") are the biological parents of the Child, who was born in March 2016. The Child was born with a missing chromosome and has extensive special needs.

Mother and Father have developmental disabilities and are "low-functioning." Mother's App. Vol. II p. 26. Mother, who also suffers from bipolar disorder, borderline personality disorder, and borderline intellectual functioning, has lived in group homes for her entire adult life. Mother requires disability support services to manage all aspects of her daily living.[2]

In August 2016, Mother and Father were arrested in Marion County for a domestic disturbance in their shared apartment, which was operated by respite care provider, Safe Journey. The Child was in the home at the time. During a preliminary inquiry by the Marion County Office of the Department of Child Services ("DCS"), Mother stated that she heard whispers; saw and heard the devil; felt sexually attracted to the Child; and experienced suicidal ideations. A subsequent DCS assessment revealed Mother's mental health diagnoses, her spotty record of taking her prescribed medication, and a recent suicide attempt.

---

[1] D.S. is not a party to this action and has consented in writing to the Child's adoption.

[2] Respite care providers "make[] sure that [Mother's] living is sustained, [] her bills are being paid [with Mother's Social Security disability income], and . . . assist in everyday living skills." Tr. Vol. II p. 100.

[6]     Nicky Bartak, who was employed as a "Qualified Intellectual Disability Professional" at Safe Journey at the time of the domestic disturbance, responded to the apartment as the police were arresting Mother and Father and as DCS was arranging to remove the Child. Tr. Vol. II p. 166. "[B]ecause of [the Child's] medical needs, [DCS] did not have a home ready for him to move to that night." *Id.* at 168. Because Bartak "was trained" regarding the Child's care and "was the one responsible for training the staff that was working with [the Child,]" DCS placed the Child in Bartak's care for the weekend. *Id.* at 168-69.

[7]     On August 15, 2016, DCS filed a petition alleging that the Child was a child in need of services ("CHINS"). At the initial hearing held that same day, Mother admitted that the Child was a CHINS due to her lack of parenting skills. DCS advised the trial court that DCS "still did not have a placement" for the Child, and the trial court ordered that the Child should remain with Bartak until DCS found a suitable placement. *Id.* at 169. Bartak has served as the Child's foster parent since his removal from Mother's and Father's care.

[8]     The trial court adjudicated the Child as a CHINS on December 1, 2016. Pursuant to the trial court's dispositional order entered the same day, Mother was required to participate in home-based case management services; undergo a sexual abuse assessment; and follow all recommendations. The trial court also approved a permanency plan for reunification.

[9] In March 2018, after a permanency hearing, the trial court noted in part the following:

> [ ] Parents have been struggling with [domestic violence] and Mother is [facing] pending criminal charges. [T]his matter has been open since August of 2016 and no provider is recommending that the [C]hild be placed in the care of either parent.
>
> * * * * *
>
> Mother's parenting time has been inconsistent due to her mental health and her inability to take all meds as prescribed.
>
> * * * * *
>
> [Guardian ad litem ("GAL")] recommends that the plan of permanency be changed to adoption. GAL states that the child is medically needy and it would be a stretch that parents would be able to meet those needs.
>
> Court notes that Mother is pregnant.
>
> [T]he Court now orders that the plan be changed to adoption.
>
> * * * * *
>
> The Court being mindful that in accordance with Ind. Code 31-34-21-55, the [Child]'s health and safety are the paramount concerns, finds that DCS has made reasonable efforts to make it possible for the [Child] to return safely to [his] home, but the services offered and available have not been effective or completed such that would allow the return of the [Child]

without Court intervention. . . .[I]t is contrary to the health and welfare of the [Child] to be returned home.

Mother's App. Vol. II pp. 26, 27.

[10] On June 27, 2018, Mother gave birth to a daughter, R. On October 3, 2018, DCS filed a petition to terminate Mother's parental rights. On October 17, 2018, and October 26, 2018, Mother was arrested after disputes with support staff and/or service providers. In each instance, one of the children was present, as was a support staffer or service provider. Afterwards, the trial court suspended Mother's visitation.

[11] The trial court conducted the fact-finding hearing on August 6 and September 5, 2019. On October 2, 2019, the trial court entered findings of fact and conclusions thereon terminating Mother's parental rights as follows:

> 55. There is a reasonable probability that the conditions that resulted in the [C]hild's removal and continued placement outside of the home will not be remedied by [his] mother. Despite having nearly three (3) years to put forth an effort, [Mother] has not demonstrated that her mental health issues have been treated sufficiently to safely parent the [C]hild. [Mother] continues to insist that she gave birth to a second child, [D.], when [the Child] was born. [ ] [Mother] continues to insist that [D.] was kidnapped and taken out of state by [the Child]'s current foster mother. She has resided in group homes her entire adult life, and still cannot have access to sharp knives.

> 56. Continuation of the parent-child relationship poses a threat to the [C]hild's well-being in that it would serve as a barrier for him obtaining permanency through an adoption when his mother is

unable to offer permanency and parent. [Mother] has not seen the [C]hild in over a year, and [the Child] has extensive special and medical needs that [Mother] cannot meet. [Mother] continues to confuse [the Child] with a child that does not exist.

57. Termination of the parent-child relationship is in the [C]hild's best interests. Termination would allow him to be adopted into a stable and permanent home where his needs will be safely met. [Mother] requires supervision for herself and she is not capable of addressing [the Child]'s special and medical needs. [The Child] requires lots of work and patience[;] foster parent provides both.

Mother's App. Vol. II pp. 18-19. The trial court also found adoption to be a satisfactory plan for the Child. Mother now appeals.

## Analysis

[12] Mother challenges the termination of her parental relationship with the Child. The Fourteenth Amendment to the United States Constitution protects the traditional rights of parents to establish a home and raise their children. *In re K.T.K. v. Indiana Dept. of Child Services, Dearborn County Office,* 989 N.E.2d 1225, 1230 (Ind. 2013). "[A] parent's interest in the upbringing of [his or her] child is 'perhaps the oldest of the fundamental liberty interests recognized by th[e] [c]ourt[s].'" *Id.* (quoting *Troxel v. Granville,* 530 U.S. 57, 65, 120 S. Ct. 2054 (2000)). We recognize, of course, that parental interests are not absolute and must be subordinated to the child's best interests when determining the proper disposition of a petition to terminate parental rights. *Id.* Thus, "'[p]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities by failing to provide for the child's

immediate and long-term needs.'" *In re K.T.K.,* 989 N.E.2d at 1230 (quoting *In re D.D.,* 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*).

[13] When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re C.G.,* 954 N.E.2d 910, 923 (Ind. 2011). We consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* We must also give "due regard" to the trial court's unique opportunity to judge the credibility of the witnesses. *Id.* (quoting Ind. Trial Rule 52(A)).

[14] Pursuant to Indiana Code Section 31-35-2-8(c), "The trial court shall enter findings of fact that support the entry of the conclusions required by subsections (a) and (b)" when granting a petition to terminate parental rights.[2] Here, the trial court did enter findings of fact and conclusions of law in granting DCS's petition to terminate Mother's parental rights. When reviewing findings of fact and conclusions of law entered in a case involving the termination of parental rights, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* We will set aside the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

[15] Indiana Code Section 31-35-2-8(a) provides that "if the court finds that the allegations in a petition described in [Indiana Code Section 31-35-2-4] are true,

the court shall terminate the parent-child relationship." Indiana Code Section 31-35-2-4(b)(2) provides that a petition to terminate a parent-child relationship involving a child in need of services must allege, in part:

(B) That one (1) of the following is true:

> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

> (ii) The court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

> (iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child.

(C) that one (1) of the following is true:

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(D) that termination is in the best interests of the child; and

(E) that there is a satisfactory plan for the care and treatment of the child.

DCS must establish these allegations by clear and convincing evidence. *In re V.A.,* 51 N.E.3d 1140, 1144 (Ind. 2016).

[16] Mother argues there is no evidence to support the trial court's conclusion that continuation of the parent-child relationship poses a threat to the well-being of the Child.[3] Mother also argues that there is no evidence that termination of her parental rights is in the best interests of the Child.

### A. Continuation of Relationship Poses Threat to Well-being

[17] First, Mother argues there is no evidence to support the trial court's conclusion that continuation of the parent-child relationship poses a threat to the well-being of the Child. Mother argues that DCS presented no evidence that Mother abused, harmed, or was unable to support, meet the physical needs of, or provide a suitable home environment for the Child.

---

[3] Mother also argues that there is no evidence to support the trial court's conclusion that the conditions that led to the Child's removal would not be remedied. Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive; therefore, we need only decide if the trial court's findings support one of these two requirements. *See In re L.S.,* 717 N.E.2d 204, 209 (Ind. Ct. App. 1999).

When considering whether there is sufficient evidence to support such a finding, trial courts must "consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation." *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 152 (Ind. 2005). "At the same time, however, a trial court should judge a parent's fitness to care for his [or her] child as of the time of the termination proceeding, taking into consideration evidence of changed conditions." *Id*.

"It is well established that 'a trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that her physical, mental, and social growth is permanently impaired before terminating the parent-child relationship.'" *In re G.F.*, 135 N.E.3d 654, 661 (Ind. Ct. App. 2019) (quoting *In re E.S.*, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002)); *see In re A.I.*, 825 N.E.2d 798, 811 (Ind. Ct. App. 2005) ("Although there was no specific testimony that either parent had physically abused [the child], there can be little doubt that the parties' serious substance abuse addictions detrimentally affected or greatly endangered her."), *trans. denied*.

The trial court entered the following findings and conclusions thereon:

> 27. The [C]hild is fed via a G-Tube and could not ingest solid foods until he was one year old.
>
> 28. [Mother] is in denial as to the [C]hild's medical issues . . . .
>
> 29. [Mother] doesn't believe the [C]hild needs a G-Tube, and has fed him chicken nuggets and French fries, stating that "if my son

wants it, I'm going to give it to him" without regard to his medical situation.

* * * * *

32. Around November 2017, when [Mother] was pregnant with R[.], she stopped taking her medication and her behavior got worse.

33. Also . . . [Mother] began to insist that she had given birth to another child, D[.], when [the Child] was born.

* * * * *

35. On October 17, 2018, [home based case manager] Ms. Rush was transporting [Mother and the Child] to a parenting time session . . . .

36. A dispute arose . . . between [Mother] and staff, and as Ms. Rush was driving [Mother] back, [Mother] attempted to get out of Ms. Rush's vehicle when it was moving.

37. Ms. Rush then stopped the vehicle, and [Mother] got out of the car, grabbed [the Child], and ran off with the [C]hild. . . . .

* * * * *

39. On October 26, 2018, during a parenting time session with R[.], [Mother] took R[.] out of her home to a Metro/PCS store at 38th Street and College Avenue. [Mother] was not authorized to have parenting time with R[.] at this time.

* * * * *

42. [At the Metro/PCS store, family case manager] Price observed as [Mother] balled up her fist and swung at [a police] officer. The officer blocked the punch, but [Mother] bit the police officer . . . .

43. [Mother] was charged[ ] and pled guilty to Battery Against a Public Safety Official (F6) and Battery (MB) for the October 26, 2018 incident.

44. Following the October 17, 2018 and the October 26, 2018 incidents, [Mother]'s parenting time was suspended . . . .

45. While residing at First Call, [Mother] became involved in an altercation with her then roommate [ ].

46. [ ] [Mother] was arrested and later pled guilty to kidnapping (F-6) from charges that arose from this incident.

\* \* \* \* \*

48. While residing at First Care,[4] [Mother] is not allowed to have access to knives due to self harm concerns.

49. [Mother] is also not permitted to have locks on her bedroom and bathroom doors.

50. As recently as late Spring-early Summer 2019, [Mother] has been involved in self-harming behaviors . . . .

---

[4] At the time of the fact-finding hearing, Mother resided in a group home operated by First Care.

51. Due to concerns about statements made by [Mother] . . . , the FCM recommended, and the Court ordered [Mother] participate in a sex abuse assessment.

52. [Mother] has not completed the sex abuse assessment . . . .

Mother's App. Vol. II pp. 17, 18.

[21] At the fact-finding hearing, the trial court heard the following evidence. Mother testified that: (1) she can raise the Child on her own and has been ready to do so since the Child was removed from her care; (2) her bipolar disorder "doesn't affect [her] at all", "does not affect [her] ability to take care of kids"; and "doesn't affect [her] ability to do anything"; and (3) "[n]othing" happens when she fails to take her prescribed medications, except that she feels "tired[.]" Tr Vol. II pp. 53, 65. Mother also testified that, after she left Safe Journey, she learned that she "had twins" when she gave birth to the Child; staffers "[we]re switching [the twins] back and forth" during visits; and Bartak was "involved" with D.'s whereabouts. *See id.* at 36, 38, 40; DCS's Ex. 17.

[22] Behavior clinician Sussette Horne of Damar Services testified that she crafted Mother's behavior support plans ("BSP"), which targeted Mother's maladaptive behaviors. Horne testified that, pursuant to Mother's most recent BSP: (1) there should be "no locks on the bedroom or bathroom door"; (2) "[w]hen appearing withdrawn, or isolated, upset . . . , [Mother] has use[d] her closet and bathroom as an escape to display severe aggression towards self, self-injurious behavior such as cutting, stabbing, insertion, and chocking [sic] self" and "should have

twenty-four-hour supervision"; and (3) "all sharp objects should be also locked away" as necessary. Tr. Vol. II pp. 114, 116.

[23] Psychiatrist Jeffrey Kellams ("Dr. Kellams") testified that he began to treat Mother in January 2019.[5] Dr. Kellams testified that stressors, including those related to parenting, can adversely affect patients with bipolar disorder and borderline personality disorder. On direct examination, Dr. Kellams testified[6]:

> Q: . . . [W]ere you able to form any opinion on how [Mother] might be able to deal with a child being introduced . . . or caring for a young child, a four-year-old?
>
> * * * * *
>
> A: Stress is definitely going to have an impact. Children have stressors that they bring with them just by the nature of children being children. And if there are disabilities associated with the Children that simply impacts the stress further.

---

[5] Dr. Kellams also testified that bipolar disorder affects patients' "predictability and ability to function on a day to day basis in terms of holding gainful employment, interpersonal relations in their interaction with children, employers, parents, next door neighbors"; and borderline personality disorder is:

> characterized by having multiple symptoms that appear basically almost from day to day, it's unpredictable. They show a lot of mood ability, suicidal ideations, suicidal attempts, unpredictability in terms of making wise reasonable choices and judgments. At times, they can appear psychotic and actually have hallucinations and delusions. At other times, they can think quite clearly and look quite good.

Tr. Vol. II p. 129.

[6] The trial court allowed the following testimony over the objections of Mother's counsel.

* * * * *

A: I think with the history that we have here of the mood fluctuation with the bi-polar illness and also the personality disturbance that occurs with . . . borderline personality disorders, it's going to be very difficult for her to, on a consistent basis, be able to provide solid parenting for a child.

* * * * *

A: Much more so because [the Child has] special needs.

*Id.* at 129, 130, 131.

[24] Tyrenna Rush, a home-based case worker and supervised visit facilitator for Family Community Partners, testified that, after two incidents in October 2018, she developed concerns for the Child's personal safety. Rush testified that, during an October 17, 2018, argument in a moving vehicle, Mother "randomly opened" the car door and "want[ed] to get out of the car"; Rush pulled the car over to defuse the situation, and Mother "proceeded to get out and . . . took [the Child] out of the car seat and started to run off with him." *Id.* at 142, 143. Rush testified: "During the incident, [the Child] could have been harmed [or] could have fell [sic] . . . when [Mother] was running with him." *Id.* at 143. Rush testified that, in the second incident, on October 26, 2018, Mother took R. out of the house in poor weather conditions at a time when Mother was not authorized to exercise parenting time. Rush testified that she called the police after both incidents, and Mother fought with the police after the October 26 incident.

Kiley Walker of First Call Residential Living testified regarding Mother's self-harm episodes. Walker testified that Mother once cut her arm with "a nail she had taken out of her dresser" and then denied staffers entry into her bathroom. *See id*. at 164. Rush also testified that, on another occasion, she found Mother "laying [sic] in front of the [bedroom] door with a sock tied around her neck" so tightly that Mother "couldn't get it off." *Id*. at 163, 164.

Foster Mother Bartak testified that being the Child's caregiver requires attentiveness and patience because the Child's medical needs are extensive. *See id.* at 178 (testifying that the Child initially needed nightly feeding pump changes and required close monitoring to ensure that the Child did not aspirate in his sleep). The Child is treated by a team of physicians and therapists and, for instance, has appointments "once a week [for] an hour-long session each week" with each of four therapists.[7] *Id*. at 173. Bartak also testified that the Child, who is nonverbal and learning sign language, frequently requires correction for inappropriate behaviors. *See id*. at 174 (testifying that when the Child is "trying to tell [Bartak] something [she] do[es]n't understand, he will

---

[7] The Child's medical providers include a pediatrician, a developmental pediatrician, and a dietician. Additionally, the Child sees "a G-tube surgeon that sees him on a regular basis to monitor the G-tube"; "a neurologist for the seizure activity"; "a pulmonologist for his breathing issues and his sleep issues"; "an eye doctor for his vision"; "his therapist for OT/PT/Speech developmental"; a "physical therapist [to teach the child to walk appropriately], a speech therapist[;] an occupational therapist[;]and [is] on the waiting list for a behaviorist." Tr. Vol. II pp. 172, 173.

throw himself to the floor," "throw things[,]" "hit," and "kick [Bartak]" "[be]cause he's frustrated").

[27] DCS family case manager Mary Price ("FCM Price") served as the Child's FCM beginning in October 2016. FCM Price testified that Mother: (1) has self-harmed even while under supervision; (2) has stated "that she wanted to kill herself and her baby"; (3) has not progressed beyond supervised visits; (4) "fought" and "kicked" multiple police officers in FCM Price's presence; (5) acknowledged a sexual attraction to the Child; and (6) failed to complete a sex offender assessment despite two referrals. *Id*. at 192, 206, 215.

[28] Former DCS FCM Stephanie Shene testified that, in August 2016, she prepared a preliminary inquiry report regarding Mother. Over Mother's objection, the trial court admitted into evidence the report, which provides, in part, as follows:

> [Mother] stated sometimes [ ] things make her mad then she sees the devil and the devil tells her she is a bad person. [Mother] stated she also started hearing . . . whispers. [Mother] stated she has not never [sic] heard these whispers before. FCM asked [Mother] what the whispers were saying. [Mother] stated it does not matter what they say because . . . she would never act on or do what the whispers tell her to do. FCM asked [Mother] if the whispers are telling her to hurt herself or someone else. [Mother] stated she did try to hurt herself. [Mother] stated she threw herself on a moving van. [ ] [Mother] further explained that she was having sexual feelings towards [the Child]. [ ] [Mother] stated sometimes when she baths [sic] [the Child] and puts lotion on him, she starts having those thoughts. [Mother] stated she knows those are wrong and they are just thoughts. [Mother] stated those thoughts are part of what caused her to try to kill herself.

*Id.* at 238-39.

[29] Mother's volatility, resistance to medical guidance, and her failure to undergo a sex offender assessment pose threats to the Child's well-being. Moreover, given the Child's extensive medical and special needs, coupled with Mother's low-functioning status, her need to be supervised herself, and related issues of self-harm, suicidal ideations, and medication management, the stress inherent in parenting the Child is beyond Mother's ability to manage and could threaten her own well-being. Based on the foregoing, DCS demonstrated by clear and convincing evidence that a substantial probability of future neglect or deprivation exists if the parent-child relationship is allowed to continue. Sufficient evidence supports the trial court's finding that continuation of the parent-child relationship poses a threat to the Child's wellbeing.

## B. Best Interests of the Child

[30] Next, Mother argues that the trial court concluded that termination of her parental rights is in the best interests of the Child "solely because there is a better place for the child to live." Mother's Br. p. 22. In determining what is in the best interests of a child, the trial court is required to look at the totality of the evidence. *See In re A.B.,* 887 N.E.2d 158, 167-68 (Ind. Ct. App. 2008). In doing so, the trial court must subordinate the interests of the parents to those of the child involved. *Id.* at 168. Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. *K.T.K.*, 989 N.E.2d at 1235. A child's need for permanency is a "central consideration" in determining the best interests of a child. *Id.*

[31] In addition to the testimony above, the trial court also heard the following testimony at the fact-finding hearing. Guardian ad litem Thomas Heath testified: "[Mother] has not demonstrated an ability to [ ] care for herself without significant help, much less a child with special needs." Tr. Vol. III p. 7. FCM Nieshia Beverly of DCS testified: "Mother has to be medicated[, and needs] people to come into her home and take care of her"; "Mother can't take care of a special needs child." Tr. Vol. II pp. 245, 246. FCM Price testified:

> . . . [Mother] is violent, she gets arrested, she gets hospitalized. She does not attend to her mental health the way that she should, she will . . . refuse to take her medication. . . . I have not seen her demonstrate the ability to have a physically safe environment for herself or anyone else.

*Id.* at 210.

[32] DCS, thus, presented evidence that: (1) Mother cannot meet her own basic needs or manage her mental health without help; (2) a direct correlation exists between Mother's ability to parent, the stability of her mood, and her stress level; (3) Mother is unwilling to accept the Child's medical limitations, which could impair his development; (4) Mother is ill-equipped to simultaneously manage the Child's vast medical needs and her own; and (5) Mother has not undergone an assessment regarding her alleged sexual feelings for the Child.

[33] The record amply supports the trial court's finding that termination of Mother's parental rights is in the Child's best interests. *In re G.F.*, 135 N.E.3d at 661 ("[A] trial court need not wait until a child is irreversibly harmed such that his

or her physical, mental, and social development is permanently impaired before terminating the parent-child relationship.").

## Conclusion

[34] Sufficient evidence supports the termination of Mother's parental rights. We affirm.

[35] Affirmed.

Riley, J., and Mathias, J., concur.